UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL CAMPA,

                              Plaintiff,

              v.

ENTERGY NUCLEAR OPERATIONS, INC.,

                              Defendant.

No. 17-CV-792 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Michael Campa
Montrose, NY
*Pro Se Plaintiff*

Christina M. Schmid, Esq.
Patrick M. Collins, Esq.
Shabri Sharma, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Michael Campa ("Plaintiff") brings this pro se Action asserting claims aginst Entergy Nuclear Operations, Inc. ("Defendant") for disability-based discrimination and failure to accommodate, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*  (*See* Am. Compl. (Dkt. No. 23).)  Before the Court is Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 (the "Motion").  (*See* Not. of Mot. (Dkt. No. 66).)  For the following reasons, the Motion is denied.

## I. Background

### A. Factual History

The following facts are taken from Defendant's statement pursuant to Local Civil Rule 56.1, (Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 69)), Plaintiff's response, (Pl.'s Resp. to Def.'s Local Rule 56.1 Statement ("Pl.'s 56.1") (Dkt. No. 85, at 1–24)), and the admissible evidence submitted by the Parties.[1]  The Court recounts only those facts necessary for consideration of the instant Motion.

#### 1. Employer and Regulatory Scheme

Defendant operates the Indian Point Energy Center (the "Center"), a nuclear power plant in Buchanan, New York.  (Def.'s 56.1 ¶ 1.)  Defendant holds a license from the U.S. Nuclear

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "If the opposing party . . . fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."  *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same).  Where possible, the Court relies on the facts as presented in the Parties' 56.1 statements.  However, direct citations to the record are used where the Parties' 56.1 statements do not include relevant facts or do not accurately characterize the record.

The Court notes that, in addition to submitting a responsive 56.1 statement, Plaintiff has filed "additional material facts supported by admissible evidence."  (Dkt. No. 85, at 24–51.)  Defendant objects to consideration of this submission.  (Reply Mem. of Law in Supp. of Mot. ("Def.'s Reply") 3 (Dkt. No. 81).)  The Court need not consider this submission because, as Defendant points out, it is substantially similar to Plaintiff's declaration submitted in opposition to the Motion, which was made under penalty of perjury pursuant to 28 U.S.C. § 1746.  (Pl.'s Decl. in Opp'n to Mot. ("Pl.'s Decl.") 1 (Dkt. No. 87).)  The Court will instead consider Plaintiff's declaration to the extent it is based on personal knowledge.  *See Cobalt Multifamily Inv'rs I, LLC v. Arden*, 857 F. Supp. 2d 349, 355–56 (S.D.N.Y. 2011) ("In order to be admissible, a letter must either be sworn and based on personal knowledge, or declared under penalty of perjury." (citations omitted)).

Regulatory Commission (the "Commission"), and as such is subject to the requirements set out in 10 C.F.R. § 73.55, regarding the physical protection of nuclear power plants. As relevant here, Defendant is required to "maintain a physical protection program, to include a security organization," that ensures "that activities involving special nuclear material are not inimical to the common defense and security and do not constitute an unreasonable risk to the public health and safety." 10 C.F.R. § 73.55(b)(1). Defendant is also required to "demonstrate the ability to meet Commission requirements through the implementation of the physical protection program, including the ability of armed and unarmed personnel to perform assigned duties and responsibilities required by the security plans." *Id.* § 73.55(b)(5).

More specifically, Defendant is required to "maintain a security organization that is . . . qualified . . . to implement [its] physical protection program," and "may not permit any individual to implement any part of the physical protection program unless the individual has been . . . qualified to perform their assigned duties and responsibilities in accordance with appendix B . . . to this part." *Id.* §§ 73.55(d)(1), (3). Appendix B, in turn, provides that Defendant "may not allow any individual to perform any security function . . . until that individual satisfies the . . . qualification requirements of this appendix and the Commission-approved . . . qualification plan, unless specifically authorized by the Commission." *Id.* app. B, Part VI, § A(6). Those qualification requirements include "[g]eneral physical qualifications": "Individuals whose duties and responsibilities are directly associated with the effective implementation of the Commission-approved security plans . . . may not have any physical conditions that would adversely affect their performance of assigned security duties and responsibilities." *Id.* § B(2)(a).

## 2. Plaintiff's Hiring and Disability

In February 2007, Plaintiff was hired by Defendant as an armed Nuclear Security Officer ("NSO") at the Center, a position housed within the Security Department and responsible for the Center's physical protection. (Def.'s 56.1 ¶¶ 5, 8; Aff'n of Christina M. Schmid, Esq. in Supp. of Mot. ("Def.'s Decl.") Ex. I (employment offer letter) (Dkt. No. 67); Def.'s Decl. Ex. B (Deposition of Michael Campa) ("Campa Dep.") 55, 74; Pl.'s Decl. in Opp'n to Mot. ("Pl.'s Decl.") ¶ 20 (Dkt. No. 87).) As an NSO, Plaintiff's responsibilities included the "[i]mplementation of defensive strategy, answering alarms, interdiction of external threat[s]," conducting searches of "vehicle[s], material[,] and personnel," and conducting "vehicle escorts" and patrols. (Def.'s Decl. Ex. C (Deposition of Daniel Gagnon) ("Gagnon Dep.") 15–16; Def.'s Decl. Ex. D (Deposition of Mitchell Wood) ("Wood Dep.") 17–18.)

The terms of Plaintiff's employment were governed by a collective bargaining agreement ("CBA"), which provides, in relevant part, that NSOs "must qualify and re-qualify" for the position "by meeting the criteria specified" by the Center. (Def.'s 56.1 ¶¶ 6–9; Def.'s Decl. Ex. J (CBA), Art. 7, § 7(a).) The CBA also provides that, where an NSO "fails . . . to maintain the necessary qualifications," or "fails to re-qualify . . . due to a bona fide medical condition," Defendant, "[i]n recognition of its potential obligation to provide reasonable accommodation for disabled individuals who can perform the essential functions of their job, . . . has the right to determine the necessity, nature, extent, and/or reasonableness of the potential accommodations, as appropriate." (CBA, Art. 7, § 7(e).)

In October 2014, Plaintiff began suffering from "severe back pain," as well as "arthritis, degenerative disk disease, sciatica, and muscle spasms," which caused him to have "difficulty standing, . . . walking, [and] jogging with the equipment" that NSOs carry. (Pl.'s Decl. ¶ 21;

Campa Dep. 56, 64–65.)  Due to his pain, Plaintiff was unable to perform the functions of an

NSO, and, accordingly, Plaintiff went on multiple leaves of absence in 2014 and 2015.  (Def.'s

56.1 ¶ 26; Pl.'s Decl. ¶ 21; Campa Dep. 53–58.)  Plaintiff's last day of active work was on

December 30, 2015, after which he was on various forms of paid and unpaid leave.  (Def.'s 56.1

¶¶ 28–31, 57.)

### 3.  The Watchperson Position

In addition to the NSO position, Defendant also employs Unarmed Nuclear Security

Officers, commonly known as Watchpersons, a position whose terms of employment are also

covered by the CBA.  (Def.'s 56.1 ¶ 11.)  According to the Watchperson position description (the

"Position Description"), Watchpersons are required to, as relevant here, "control entry

processing of all individuals into protected and vital areas of the [Center]"; "conduct personnel

and vehicle searches in accordance with the [Center's] security requirements"; "make scheduled

and unscheduled monitoring of the [Center's] protected and vital areas"; "report all security and

safety violations observed"; "secure, protect, and assist at scenes of accidents, fires, and similar

events"; "operate company vehicle[s] during patrol"; "conduct operational tests of intrusion

detection[] and contraband detection equipment"; be "subject to emergency call-in, 12 hour

shifts[,] and [to] work[ing] under adverse weather conditions"; and have the "physical stamina

for walking, climbing, etc., as per [Commission] regulations for a Watchperson."  (Def.'s Decl.

Ex. K (Position Description) (initial capitalization removed throughout).)

In order to qualify for the Watchperson position, an individual must pass an annual

evaluation that demonstrates the ability to perform each of the functions set forth on the Security

Critical Task Qualification Record, known as the "Qualification Card," prepared by Defendant

"in accordance with [Commission] regulations."  (Def.'s 56.1 ¶¶ 18–20; Def.'s Decl. Ex. L

(Qualification Card); *see also* 10 C.F.R. § 73.55(c)(4).)  Those functions include the ability to "perform visitor access control"; "conduct personnel access to [protected areas and vital areas]" of the Center; "conduct personnel searches"; "perform material" and "vehicle search[es]" and "escort functions"; "conduct security patrols"; "provide compensatory measures"; "conduct area searches"; "respond to contingency events & execute defensive strategy"; "react to bomb, hostage, and civil disturbance situations"; and "perform non-lethal defense measures." (Qualification Card (initial capitalization removed throughout).)

According to Daniel Gagnon ("Gagnon"), a Security Manager and supervisor at the Center, in order to conduct a vehicle search as required by the Qualification Card, a Watchperson must search the driver, climb into the vehicle and search every compartment, including the hood, truck, and glove compartment; search under the carriage of the vehicle using a long-handle mirror; search the top of the vehicle with the use of a ladder, if necessary; and climb up into the bed of the vehicle.  (Gagnon Dep. 15, 21, 94–96.)  Plaintiff disputes Gagnon's characterization "to the extent it forecloses the ability to use other tools to search the locations identified, such as movable stairs, a scissor lift, a stationary pully system . . . , a stationary mirror, a swivel seat, a car cane, . . . a strap to use for standing, video surveillance equipment, or other vehicle access mobility aides."  (Pl.'s 56.1 ¶ 23; Campa Dep. 147–51.)  Gagnon also states that a Watchperson must be able to move large or heavy items in vehicles to search around them.  (Gagnon Dep. 21, 41–42.)  Plaintiff disputes this contention and states that, in fact, "it is the responsibility of the operator of the vehicle to move any large or heavy items."  (Pl.'s 56.1 ¶ 24.)

### 4.  Plaintiff's Application for the Watchperson Position

On April 6, 2016, Plaintiff and his physician, Dr. Lucy Perazzo ("Dr. Perazzo"), together determined that his lower back pain prevented him from returning to the NSO position

"[b]ecause the physical limitations of [his] disability prevented [him] from carrying out all the necessary responsibilities of an [NSO]." (Def.'s 56.1 ¶ 32; Campa Dep. 63, 69–72.) They also concluded that Plaintiff's lower pack pain would not prevent him from performing the functions of the Watchperson position, because the Watchperson position did not involve — according to Plaintiff's personal observations and communication with other employees at the Center — the "carry[ing] . . . of . . . equipment" (as the NSO position did) or "doing anything arduous or strenuous," and allowed individuals "the ability to sit and stand as needed." (Campa Dep. 73–75, 100; Def.'s 56.1 ¶ 33; Pl.'s 56.1 ¶ 33.)

On April 25, 2016, Plaintiff emailed Gagnon and Mitchell Wood ("Wood"), the Center's Security Superintendent, and others, to state that he had been cleared by Dr. Perazzo to return to work on May 2, 2016, but not to "full duty." (Def.'s 56.1 ¶ 34; Def.'s Decl. Ex. O (Apr. 25, 2016 email correspondence); Campa Dep. 61–62; Wood Dep. 59.) Plaintiff also stated that he was "aware" that there were no "light duty status/positions" available, and that he "wanted to talk . . . about assuming one of the [Watchperson] positions." (Def.'s Decl. Ex. O.) Wood responded to Plaintiff by saying that, "[a]ssuming a [Watchperson] position is not an option, you must be cleared to return to work full duty." (*Id.*)

Subsequently, Plaintiff submitted a Healthcare Provider Release to Return to Work form (the "Medical Release Form"), completed and signed by Dr. Perazzo, which stated that Plaintiff, although cleared to return to work, was "advised not to carry more than 10 [pounds] of equipment," and that the "duration of [this] restriction is uncertain at this time." (Def.'s 56.1 ¶¶ 37–38; Def.'s Decl. Ex. P (Medical Release Form).) On May 11, 2016, Christie Anglin ("Anglin"), a human resources employee with Defendant, acknowledged receipt of the Medical Release Form but told Plaintiff that "[his] supervisor is not able to accommodate" his restrictions

as to the sought-after Watchperson position.  (Def.'s 56.1 ¶ 39; Def.'s Decl. Ex. Q (May 11, 2016 email from Anglin to Plaintiff).)  Plaintiff and Anglin thereafter spoke, during which conversation, according to a June 1, 2016 email sent by Anglin to Plaintiff after the fact, Plaintiff "stated that [he] will not be able to return to work as [an NSO]" and again "requested an accommodation in the form of [a] job reassignment [to Watchperson]."  (Def.'s 56.1 ¶¶ 40–41; Def.'s Decl. Ex. R (June 1, 2016 email from Anglin to Plaintiff).)  Anglin responded that Plaintiff must submit an Accommodation Request Form and have Dr. Perazzo complete an Essential Job Functions Form (the "EJF Form") regarding Plaintiff's ability to serve as a Watchperson.  (Def.'s 56.1 ¶ 42; Def.'s Decl. Ex. R.)

However, an EJF Form did not yet exist for the Watchperson position.  (Def.'s 56.1 ¶ 40.) According to Defendant, that is because no NSO who had previously transitioned to Watchperson had medical restrictions that affected his performance of the Watchperson position. (*Id.*; Gagnon Dep. 52, 60–61.)  Plaintiff disputes Defendant's explanation and identifies three NSOs-turned-Watchpersons who had medical conditions — Anton Varga ("Varga"), who had "low pulmonary functioning"; Robert Mazzuchelli, who had "pulmonary and heart problems"; and Roger Daggett ("Daggett"), who was overweight.  (Pl.'s 56.1 ¶¶ 43–44; Campa Dep. 81–90, 190–92; Def.'s Decl. Ex. G (Deposition of Anton Varga) ("Varga Dep.") 29–30; Def.'s Decl. Ex. H (Deposition of Roger Daggett) ("Daggett Dep.") 25–26.)  In response, Defendant states that "[i]n fact, only . . . Varga[] suffered from any medical condition to [its] knowledge," and "that condition affected only Varga's ability to perform the essential functions of an . . . NSO — not those of a Watchperson — and Varga did not have any restrictions for the Watchperson position."  (Def.'s 56.1 ¶ 44; Gagnon Dep. 51; Wood Dep. 86–87, 104; Varga Dep. 30–31, 74.)

Indeed, Plaintiff conceded that he was "speculating about what those [identified] individual[s'] medical conditions . . . [and] restrictions [were]." (Campa Dep. 193–94.)

Because no EJF Form existed for the Watchperson position, Gagnon and Wood determined the essential functions of the position and sent a list to Defendant's human resources team, which created the form. (Def.'s 56.1 ¶¶ 46–49; Gagnon Dep. 51–54.) The finalized EJF Form listed four essential functions:

> (1) May work in either an indoor or outdoor environment, and duties may involve rigorous outdoor activities to include lifting a reasonable amount of weight greater than 10 pounds. In addition, respond to alarms, intruders, or other security contingency situations.
> (2) Must be able to sit and stand for prolonged periods of time.
> (3) Must have regular and reliable attendance.
> (4) Must be able to climb from 2–10 flights of stairs.

(Def.'s Decl. Ex. S, at 7 (EJF Form).)

On June 10, 2016, Plaintiff submitted a completed EJF Form, as filled out and signed by Dr. Perazzo. (Def.'s 56.1 ¶ 51.) On the form, Dr. Perazzo indicated that Plaintiff could not perform the first listed essential function either with or without accommodation. (EJF Form.) Dr. Perazzo also indicated that Plaintiff could perform the second essential function with accommodation, namely, "short break periods," and that he could perform the third and fourth essential functions without accommodation. (*Id.*)

Also on June 10, 2016, Plaintiff submitted a completed Medical Information Request Form, as filled out and signed by Dr. Perazzo, in which Dr. Perazzo reiterated her conclusions on the EJF Form and further wrote that Plaintiff was "limited in [his] ability to carry heavy loads (advise [less than] 10 [pounds])"; was "unable to run" or "jump"; had "difficulty getting in and out of car[s] [and] rising from seated position"; was "unable to safely respond to alarms, intruders, or other security contingency situations"; was "unable to perform rigorous outdoor

activities or lift weights [greater than] 10 [pounds] or perform duties required in response to intruders"; required "rest periods to break up prolonged sitting [or] standing"; and should "avoid running[] [or] carriage of supplies [greater than] 10 [pounds]." (Def.'s Decl. Ex. S, at 4–6 (Medical Information Request Form).) As to duration, Dr. Perazzo stated that Plaintiff's restrictions were "[l]ong-term, anticipate life-long." (*Id.*)

Plaintiff further submitted a completed Accommodation Request Form, in which he stated that he "suffer[s] from severe lower back pain"; that "wearing a tactical vest and the extra weight exacerbates the condition"; that he "cannot respond tactically due to these restrictions"; that "prolonged sitting" and "prolonged standing" affect his condition; that his condition is "life long and permanent"; and that the Watchperson position would help him avoid "the rigors of carrying all the extra weight on [his] back." (*Id.* at 3 (Accommodation Request Form).)

### 5. Defendant's Denial of Plaintiff's Application and Plaintiff's Subsequent Termination

Based on Plaintiff's submissions, Defendant determined that Plaintiff could not perform the essential functions of the Watchperson position with or without reasonable accommodations. (Def.'s 56.1 ¶¶ 54–56; Gagnon Dep. 39–42 (noting that "there [were] two things that . . . were concerning for us," namely, "the limitation of lifting no more than ten pounds" and "the ability to . . . get in and out of a car" to conduct a search).) On June 27, 2016, Defendant communicated its conclusion to Plaintiff, and asked if Plaintiff would be interested in applying to another vacant position for which he may be qualified. (Def.'s 56.1 ¶¶ 58, 60; Pl.'s 56.1 ¶¶ 58, 60.) Plaintiff contested the conclusion based on his personal observation that Watchpersons did not perform any "arduous or strenuous" tasks or do any "heavy lifting." (Def.'s 56.1 ¶ 59; Campa Dep. 73, 100–01, 104, 141.)

According to Plaintiff, someone on Defendant's human resources team had told him that Defendant could not accommodate a 10-pound weight restriction and that "it has to be at least 25 pounds." (Campa Dep. 136–37.) In July 2016, Plaintiff submitted to Defendant a second letter from Dr. Perazzo, dated June 29, 2016, stating — on Plaintiff's recommendation — that Plaintiff was "ready to return to work but understands his limitations are restrictive of him from running or jumping or carrying packs more than 25 pounds." (Def.'s 56.1 ¶¶ 61–62; Def.'s Decl. Ex. T (June 29, 2016 letter from Dr. Perazzo to Defendant); Campa Dep. 132, 137, 154–57.)

Because Defendant perceived the June 29, 2016 letter from Dr. Perazzo as inconsistent with her other recent submissions — in which she certified that Plaintiff could not lift more than ten pounds and that this restriction would be lifelong — Anglin requested on July 29, 2016 that Plaintiff execute a release form authorizing Defendant's medical consultant, Denis Petit, R.N. ("Nurse Petit"), to contact Dr. Perazzo to discuss the issue directly. (Def.'s 56.1 ¶¶ 63–65; Def.'s Decl. Ex. U (July 29, 2016 email from Anglin to Plaintiff).) Plaintiff provided the release. (Def.'s 56.1 ¶ 66.) On August 26, 2016, Dr. Perazzo sent Nurse Petit a letter stating that she had seen Plaintiff on June 10, 2016, "at which time it was determined that he [was] unable to lift greater than 10 [pounds]," as indicated on the EJF Form, and that Plaintiff thereafter had received kinesiotherapy, had "improved," and could now "carry[] weights of 25 [pounds]." (Def.'s 56.1 ¶¶ 68–69; Def.'s Decl. Ex. V (Aug. 26, 2019 letter from Dr. Perazzo to Nurse Petit); Campa Dep. 131–32.)

On August 31, 2016, Anglin emailed Plaintiff and stated that she had received the August 26, 2016 letter from Dr. Perazzo "in response to [Defendant's] inquiry regarding [Plaintiff's] restriction accommodation," that "only one of the questions asked was answered," and that, because Dr. Perazzo "was unable to thoroughly answer the questions provided, a second medical

exam is required in order to continue with the review of [Plaintiff's] restriction accommodation."
(Def.'s 56.1 ¶ 71; Def.'s Decl. Ex. W (Aug. 31, 2016 email from Anglin to Plaintiff).)

In October 2016, Plaintiff completed an independent medical evaluation with Robert
Sadock, M.D. ("Dr. Sadock"), an independent physician retained by Defendant. (Def.'s 56.1
¶¶ 72–73; Campa Dep. 176–77.) On October, 19, 2016, Plaintiff submitted to Defendant a
second EJF evaluation (the "Sadock EJF Form"), completed and signed by Dr. Sadock, in which
Dr. Sadock concluded that Plaintiff was unable to perform the first and fourth essential functions
of the Watchperson position either with or without accommodation, but that he was able to
perform the second and third essential functions with accommodation. (Def.'s 56.1 ¶¶ 73–74;
Def.'s Decl. Ex. X, at 3 (Sadock EJF Form); Campa Dep. 178.) Dr. Sadock also completed a
separate written evaluation, in which he stated that Plaintiff's limitations were "likely long
term"; that Plaintiff should avoid "lifting heavy objects" and "restraining people"; and that, as an
accommodation, Plaintiff should have a "very low activity job[]" or "desk work." (Def.'s Decl.
Ex. X, at 2.)

On November 17, 2016, Defendant informed Plaintiff that, based on Dr. Sadock's
submissions, it again concluded that Plaintiff was "unable to perform the essential functions of
the [Watchperson] position with or without reasonable accommodation" and that "there does not
appear to be any medical information showing that, in the reasonably foreseeable future,
[Plaintiff] can return to work to perform the essential functions of your job (or even the
[Watchperson] position) with or without reasonable accommodation." (Def.'s 56.1 ¶¶ 75–77;
Def.'s Decl. Ex. Y (Nov. 17, 2016 letter from Defendant to Plaintiff) ("Termination Letter").)
Defendant again encouraged Plaintiff to apply for a position for which he may be qualified, and
further noted that Plaintiff had applied for the Nuclear Health Services Tech position, for which

he was "not qualified." (Def.'s 56.1 ¶¶ 76, 78; Termination Letter; Campa Dep. 179–80.)

Defendant also stated that it would "mov[e] forward to separate the employment relationship."

(Termination Letter.) On December 12, 2016, Plaintiff's employment was terminated. (Def.'s

56.1 ¶ 79; Campa Dep. 43.)

### B. Procedural History

The initial Complaint was filed on January 31, 2017. (Compl. (Dkt. No. 2).) On

February 13, 2017, the Court granted Plaintiff's request to proceed in forma pauperis ("IFP").

(Dkt. No. 3.) The instant Amended Complaint was filed on October 24, 2017. (Am. Compl.

(Dkt. No. 23).) Defendant filed an Answer on the same date. (Dkt. No. 24.)

On January 18, 2019, Defendant filed the instant Motion for Summary Judgment and

accompanying papers. (Not. of Mot.; Def.'s Decl.; Def.'s Mem. of Law in Supp. of Mot.

("Def.'s Mem.") (Dkt. No. 68); Def.'s 56.1.) Plaintiff's response in opposition to the Motion

was filed on the docket on May 22, 2019. (Pl.'s 56.1; Pl.'s Mem. of Law in Opp'n to Mot.

("Pl.'s Mem.") (Dkt. No. 86); Pl.'s Decl.) Defendant, which presumably received Plaintiff's

opposition directly at an earlier date, filed a reply which appeared on the docket on May 17,

2019. (Def.'s Reply; Reply Aff'n of Christina M. Schmid, Esq. in Supp. of Mot. ("Def.'s Reply

Decl.") (Dkt. No. 82); Decl. of Megan Edwards in Supp. of Mot. ("Edwards Decl.") (Dkt. No.

83).) On June 14, 2019, Plaintiff filed an authorized sur-reply. (Pl.'s Sur-Reply Mem. of Law in

Opp'n to Mot. ("Pl.'s Sur-Reply") (Dkt. No. 91).) On July 3, 2019, Defendant filed an

authorized response to the sur-reply. (Reply Mem. of Law in Supp. of Mot. ("Def.'s Sur-Reply")

(Dkt. No. 94).)

Defendant has sent the required Local Civil Rule 56.2 Notice to Plaintiff. (Dkt. No. 65.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation, alteration, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion," the nonmovant must "create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014)

(quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation and quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc*., 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments

of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quotation marks omitted)). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010). Even where a plaintiff's "evidence may be thin, [his] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted).[2]

B. Analysis

Plaintiff brings claims under the ADA and the NYSHRL alleging that Defendant discriminated against him on the basis of his disability — his severe lower back pain — and failed to accommodate Plaintiff's request to be reassigned to a Watchperson position. (*See* Am.

---

[2] The Court notes that Plaintiff's filings in opposition to the instant Motion were "prepared with assistance from the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants in the SDNY" ("NYLAG"). (*See* Pl.'s Mem. 1 n.1; Pl.'s Decl. 1 n.1; Pl.'s Sur-Reply 1 n.1). In light of this assistance, Defendant requests that the Court not grant Plaintiff the special solicitude normally afforded to pro se litigants. (*See* Def.'s Reply 2 n.1.) In response, Plaintiff argues — in a document itself prepared with assistance from NYLAG — that "NYLAG provided only limited assistance" and that "[i]f pro se litigants who receive limited assistance from NYLAG lose all protections afforded to them, NYLAG faces a catch-22: providing less than full representation will harm litigants by eliminating the special care otherwise afforded." (Pl.'s Sur-Reply 1 n.1.) The Court need not resolve this dispute because the Court concludes that Defendant's Motion fails regardless whether Plaintiff is afforded special solicitude. The Court notes, however, that two recent cases have denied special solicitude in similar circumstances. *See Littlejohn v. Consol. Edison Co. of N.Y., Inc.*, No. 18-CV-6336, 2019 WL 3219454, at *1 n.1 (S.D.N.Y. July 17, 2019); *Price v. City of New York*, No. 15-CV-5871, 2018 WL 3117507, at *5 n.5 (S.D.N.Y. June 25, 2018) (same).

Compl. 4–5.)  Defendant seeks summary judgment principally on grounds that Plaintiff was not a

"qualified individual" for purposes of the ADA or the NYSHRL because he could not perform

the essential functions of the Watchperson position.  (*See* Def.'s Mem.; Def.'s Reply; Def.'s Sur-

Reply.)

> 1.  Applicable Law

Disability discrimination claims under the ADA and the NYSHRL are analyzed under the

burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corporation v.*

*Green*, 411 U.S. 792 (1973).  *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir.

2013).  Under this test, a plaintiff must first establish a prima facie case of disability

discrimination.  *Id.*  To do so, a plaintiff must demonstrate that: "(1) his employer is subject to

the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to

perform the essential functions of his job, with or without reasonable accommodation; and (4) he

suffered adverse employment action because of his disability."  *Id.* (citation omitted).  If an

employee establishes a prima facie case of discrimination, the burden shifts to the defendant-

employer, who may rebut his claim with legitimate, non-discriminatory reasons for the adverse

employment action.  *See Sattar v. Johnson*, 129 F. Supp. 3d 123, 137 (S.D.N.Y. 2015), *aff'd*, 669

F. App'x 1 (2d Cir. 2016).  "The defendant need not persuade the court that it was actually

motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine

issue of fact as to whether it discriminated against the plaintiff."  *Tex. Dep't of Cmty. Affs. v.*

*Burdine*, 450 U.S. 248, 254–55 (1981) (citation omitted).  If the defendant presents legitimate

reasons for the employment action, the burden shifts back to the plaintiff to plausibly allege "the

legitimate reasons offered by the defendant were not its true reasons, but were a pretext for

discrimination."  *Sattar*, 129 F. Supp. 3d at 137 (citing *Patterson v. County of Oneida*, 375 F.3d

206, 221 (2d Cir. 2004)).  "New York State disability discrimination claims are governed by the same legal standards as federal ADA claims."  *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004) (citation omitted).  The Court will thus analyze the Plaintiff's ADA and NYSHRL claims in tandem.  *See Novick v. Vill. of Wappingers Fall*s, 376 F. Supp. 3d 318, 342 (S.D.N.Y. Mar. 27, 2019) (analyzing ADA and NYSHRL claims together).

## 2.  Application

There is no dispute, for purposes of this Motion, that Defendant is subject to the ADA, that Plaintiff's lower back pain rendered him disabled within the meaning of the ADA, or that Plaintiff suffered adverse employment action because of his disability.  The only question, then, is whether Plaintiff was "otherwise qualified to perform the essential functions of" the Watchperson position either "with or without reasonable accommodation."  *McMillan*, 711 F.3d at 125; *accord* 42 U.S.C. § 12111(8) (defining "qualified individual" as one who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual . . . desires").

"'Essential functions' are defined under EEOC regulations to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Shannon v. N.Y.C. Trans. Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (citations omitted); *accord* 29 C.F.R. § 1630.2(n)(1).  "A job function may be considered essential for any of several reasons, including but not limited to the following:"

> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

29 C.F.R. § 1630.2(n).

"In evaluating whether a particular job function is 'essential,' this Court considers" several factors, including "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017) (citing *McMillan*, 711 F.3d at 126; 29 C.F.R. § 1630.2(n)(3)). Further, "[c]ourts must conduct a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." *Id.* (citation and quotation marks omitted). "No one factor is dispositive, and the regulations themselves state that these examples are non-exhaustive." *Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 128 (E.D.N.Y. 2014) (citing *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)); *see also Stevens*, 851 F.3d at 229 (same); *Rodal*, 369 F.3d at 120 ("[U]ltimately, the question whether a task constitutes an essential function depends on the totality of the circumstances." (citation omitted)).

Here, beginning with the employer's judgment, the record shows that Gagnon, Defendant's Security Manager, and Wood, Defendant's Security Superintendent, together determined that there are four essential functions of the Watchperson position:

(1) May work in either an indoor or outdoor environment, and duties may involve rigorous outdoor activities to include lifting a reasonable amount of weight greater than 10 pounds. In addition, respond to alarms, intruders, or other security contingency situations.

(2) Must be able to sit and stand for prolonged periods of time.

(3) Must have regular and reliable attendance.

(4) Must be able to climb from 2–10 flights of stairs.

(EJF Form.)  Gagnon and Wood arrived at this determination by relying on their personal

knowledge of the Watchperson position, the Position Description, and the Qualification Card.

(Gagnon Dep. 19–27, 52–54.)

Defendant's judgment of the essential functions of the Watchperson position, as

manifested on the EJF Form, is entitled to "considerable deference."  *Shannon*, 332 F.3d at 100;

*see also Hunt-Watts*, 43 F. Supp. 3d at 128 ("An employer's judgment is 'highly relevant

evidence' as to essential functionality . . . ." (citation omitted)).[3]  That is especially so given that

the Watchperson position — which is responsible for the physical safety of a nuclear power plant

— implicates obvious public safety concerns, and that Defendant is required under 10 C.F.R.

Part 73 to ensure the Center's physical safety.  *See Lute v. Dominion Nuclear Conn., Inc.*, No.

12-CV-1412, 2015 WL 1456769, at *11 n.8 (D. Conn. Mar. 30, 2015) ("The sensitive nature of

the nuclear power industry and the extensive regulation of that industry by the [Commission]

both suggest that the consideration given to the employer's determinations in this area should be

especially deferential." (citation omitted)); *see also D'Amico v. City of New York*, 132 F.3d 145,

151 (2d Cir. 1998) (noting that "[a] court necessarily must consider both the type of position for

which the plaintiff claims to be otherwise qualified, and the consequences of a potential

mishap").

However, as Plaintiff points out, (Pl.'s Mem. 12–13), Defendant's judgment is, of course,

not dispositive.  *See Hunt-Watts*, 43 F. Supp. 3d at 128 ("No one factor is dispositive, and the

---

[3] Plaintiff argues that the EJF Form is not entitled to deference because it "was only
created *after* [he] applied for" the Watchperson position and, under 42 U.S.C. § 12111(8), only
"if an employer has prepared a written description *before* advertising or interviewing applicants
for the job . . . shall [it] be considered evidence of the essential functions of the job."  (Pl.'s
Mem. 14 (emphasis added).)  Yet, the EJF Form is not a job description, and there is no dispute
that the Watchperson Position Description, to which § 12111(8) applies, was created before
Plaintiff applied to be a Watchperson.

regulations [at 29 C.F.R. § 1630.2(n)] themselves state that [the listed factors] are non-exhaustive."); *see also Stone*, 118 F.3d at 99 (noting that, although the "employer's judgment as to which functions are essential is highly relevant evidence, it is only one of the regulations' seven illustrative categories of evidence" (citation and quotation marks omitted)). The Court thus proceeds to consider whether, notwithstanding the EJF Form, a dispute of material fact exists as to the essential functions of the Watchperson position.

Plaintiff first argues that neither the Watchperson Position Description nor the Qualification Card, from which the EJF Form was derived, specify any specific minimum weight a Watchperson must carry or number of stair flights a Watchperson must climb. (Pl.'s Mem. 10–12.)[4] Plaintiff is correct. As described above, both documents use general language. The Position Description states that Watchpersons must, among other things, "control entry processing of all individuals into protected and vital areas of the [Center]"; "conduct personnel and vehicle searches in accordance with the [Center's] security requirements"; "make scheduled and unscheduled monitoring of the [Center's] protected and vital areas"; "report all security and safety violations observed"; "secure, protect, and assist at scenes of accidents, fires, and similar events"; "operate company vehicle[s] during patrol"; "conduct operational tests of intrusion detection[] and contraband detection equipment"; be "subject to emergency call-in, 12 hour shifts[,] and [to] work[ing] under adverse weather conditions"; and have the "physical stamina for walking, climbing, etc., as per [Commission] regulations for a Watchperson." (Position Description (initial capitalization removed throughout).) And the Qualification Card states that

---

[4] Plaintiff focuses on these putative essential functions because they are the functions he was marked as being unable to perform either with or without accommodation, (*see* EJF Form; Dr. Sadock EJF Form), and with which Defendant was principally concerned in denying Plaintiff's request to become a Watchperson, (*see* Gagnon Dep. 41).

Watchpersons must demonstrate the ability to, among other things, "perform visitor access control"; "conduct personnel access to [protected areas and vital areas]" of the Center; "conduct personnel searches" (including with a "hand-held metal detector"); "perform material" and "vehicle search[es]"; "perform vehicle & material escort functions"; "conduct security patrols"; "provide compensatory measures"; "conduct area searches"; "respond to contingency events & execute defensive strategy"; "react to bomb, hostage, and civil disturbance situations"; and "perform non-lethal defense measures." (Qualification Card (initial capitalization removed throughout).) Neither document contains the ten-pound weight minimum or two-to-ten-flight range stated on the EJF Form, and Gagnon acknowledged as much in his deposition testimony. (Gagnon Dep. 55–57.)

Conspicuously, Defendant entirely fails to respond to this point. (*See generally* Def.'s Reply; Def.'s Sur-Reply Opp'n.) The Court finds this omission significant, particularly given that, as Plaintiff argues, (Pl.'s Mem. 14), the record evidence shows that the EJF Form was created *after* Plaintiff first requested accommodation and submitted a Medical Release Form squarely stating that he was "advised not to carry more than ten pounds of equipment," (Def.'s 56.1 ¶¶ 43, 46–49; Gagnon Dep. 51–54, 60–61; Wood Dep. 186; Medical Release Form).[5]

Plaintiff next argues that the experience of past and present Watchpersons shows, contrary to the EJF Form, that the essential functions of the position do not involve lifting weight above ten pounds or climbing up to ten flights of stairs. (Pl.'s Mem. 6–10.) For example, Varga,

---

[5] In Plaintiff's view, this sequence of events, combined with the unexplained numerical specificity on the EJF Form, "suggest[s]" that the EJF Form "was tailored to . . . ensure" that Plaintiff would not be qualified the Watchperson position. (Pl.'s Mem. 14.) Plaintiff's theory of the case is that Defendant acted in this way because it "regarded" the Watchperson "positions as rewards for guards with many more years of experience than [Plaintiff]." (*Id.* at 1.) The Court need not address Plaintiff's theory for purposes of the instant Motion.

a current Watchperson, testified that Defendant does not "have requirements for how much weight you have to carry" to be Watchperson, (Varga Dep. 17, 29); that the Watchperson position involves "very little lifting," because it is the responsibility of the driver whose vehicle is being searched (and not the Watchperson) to move heavy objects and because any equipment used in the search process weighs less than ten pounds, (*id.* at 78); that he did not walk more than one flight of stairs up or down except in rare cases where the elevator was out of service, (*id.* at 81–82); and that he did "not climb[] into the vehicle" to conduct a search, and instead would stand "just outside the door, bending down, looking up," (*id.* at 95–98). Similarly, Daggett, a former Watchperson, testified that he spent his daily shift as a Watchperson watching security footage, not lifting objects or searching vehicles, (Daggett Dep. 31–32), and that, when asked whether he "encounter[ed] rigorous outdoor activities," he stated that he "wouldn't say it's rigorous," (*id.* at 34).

To be sure, this is not a case in which the testimonial evidence all cuts against the putative essential functions as listed on the EJF Form. For example, Varga testified that he sometimes lifts weight above ten pounds when picking up items in the warehouse, (Varga Dep. 78), and that, when conducting vehicle searches, he climbs into the cab of the vehicle and sometimes atop or into the back the vehicle, (*id.* 95–98). Daggett testified that he did have to lift weight above ten pounds (although he did not specify when or how often), and that he "used to walk up a hill a lot, . . . [s]ometimes one, two, three, four, five flights occasionally." (Daggett. Dep. 30, 33.) And Gagnon — although himself never a Watchperson — testified that it is Watchpersons, not vehicle drivers, who are expected to move objects in vehicles where they weigh about 20 to 25 pounds, (Gagnon Dep. 24–25, 68); that the 16-foot mirror tool used to conduct searches of the tops of vehicles, although itself weighing less than ten pounds, exerts

greater than ten pounds of strain on the body when extended, (*id.* at 42); and that the Center is situated on a large and uneven property "built on the side of a mountain, so it's a lot of stairs," (*id.* at 22).  However, Gagnon also testified, seemingly contrary to his other testimony, that Watchpersons "would not [be] require[d] . . . to carry 25 pounds," at least "[u]nder normal conditions."  (Gagnon Dep. 42–43.)  Similarly, Wood — also never a Watchperson — testified that "I don't believe that [Watchpersons] have that type of duty that they have to accommodate themselves for an additional 25 pounds or even lift 25 pounds."  (Wood Dep. 136.)

This conflicting testimony — particularly when considered in light of the above-described discrepancy in specificity between the EJF Form and the Position Description and Qualification Card — only reinforces the question whether the ability to lift more than ten pounds and climb up to ten flights of stairs, as stated on the EJF Form, is essential to the Watchperson position.[6]  Indeed, the Court finds it significant that there is *no* testimony from any current or former Watchperson squarely indicating that his functions included lifting substantial weight or climbing substantial amounts of stairs.  Nor is there testimony regarding the frequency with which vehicle searches (and the attendant lifting and moving of objects) are performed. Defendant protests that evidence of frequency is "not required" to show that a function is essential for purposes of the ADA.  (Def.'s Reply 6 n.3.)  That is true, yet, as noted, "the amount of time spent on the job performing the function" is a factor to be considered.  *Stevens*, 851 F.3d at 229; *see also* 29 C.F.R. § 1630.2(n)(3).  Moreover, courts have denied summary judgment in

---

[6] Plaintiff also points to his own deposition testimony and declaration regarding his view of the functions of the Watchperson position.  (Pl.'s Mem. 8–9; Campa Dep. 73–75, 100, 141–43, 146–52; Pl.'s Decl. ¶ 13.)  The probative value of this evidence, however, is limited, given that Plaintiff admitted his knowledge of the functions of a Watchperson was based on limited and infrequent observation of just three persons who held the position.  (Campa Dep. 100–01, 143–44.)

disability discrimination cases where evidence of frequency was relevant to the question of whether a particular function was essential. *See Kosack v. Entergy Enters., Inc.*, No. 14-CV-9605, 2019 WL 330870, at *10 (S.D.N.Y. Jan. 25, 2019) (denying summary judgment on ADA claim where "[t]he record [did] not . . . reflect when and how frequently receipt inspectors, like plaintiff, *actually* worked overtime for outages" and, accordingly, there were "genuine issues of material fact as to whether working overtime was an essential function"); *Schroeder v. Suffolk Cty. Cmty. Coll.*, No. 07-CV-2060, 2009 WL 1748869, at *13 (E.D.N.Y. June 22, 2009) (denying summary judgment on ADA claim where there was "a triable issue of how much time is actually required or spent on the job's physical requirements that necessarily implicate [the] plaintiff's foot condition").

The Court is cognizant that, as the holder of a license granted by the Commission, Defendant must comply with regulations requiring that unarmed security personnel pass annual assessments demonstrating that they meet the physical requirements (as set out in the regulations and licensees' plans) — meaning in plain terms that Watchpersons must demonstrate that they have the physical capacity to, as relevant here, conduct a vehicle search in a manner compliant with the regulations and on Defendant's Qualification Card. *See* 10 C.F.R. § 73.55(h); *id.* app. B, Part VI, § B(5)(a). (*See* Def.'s Mem. 7–8; Def.'s Reply 5–8; Gagnon Dep. 94–96; Decl. of Daniel Gagnon in Further Supp. of Def.'s Mot. ("Gagnon Decl.") ¶¶ 2–5, 18 (Dkt. No. 84) (sealed).)[7] Yet, as noted, the Qualification Card does not state that, in conducting a vehicle search, a Watchperson must be capable of lifting more than ten pounds, climbing into the vehicle to lift or move objects, or climbing up to ten flights of stairs. (*See* Qualification Card.) Nor does

---

[7] Gagnon's Declaration, which contains sensitive information relating to the physical security of the Center, was filed under seal pursuant to this Court's Order dated May 10, 2019. (Dkt. No. 79.)

Defendant's vehicle search procedure, the document upon which the Qualification Card is based, state as much. (*See* Gagnon Decl. Ex. A (sealed).) Put differently, although Defendant of course "must comply with its own security procedures" and with Commission regulations, (Def.'s Reply 8), Defendant fails to explain where, exactly, in those procedures or regulations it is made essential that a Watchperson be capable of lifting more than ten pounds or climbing up to ten flights of stairs.

In sum, the Court, having "consider[ed] the whole record," *Shannon*, 332 F.3d at 100, and the "totality of the circumstances," *Rodal*, 369 F.3d at 120, concludes that the evidence, viewed in the light most favorable to Plaintiff, presents a genuine dispute of material fact as to whether the "essential functions" of the Watchperson position — that is, its "*fundamental . . . duties*," 29 C.F.R. § 1630.2(n)(1) (emphasis added); *accord Shannon*, 332 F.3d at 100 — include lifting greater than ten pounds and climbing up to ten flights of stairs. *See Monroe v. County of Orange*, No. 14-CV-1957, 2016 WL 5394745, at *13 (S.D.N.Y. Sept. 27, 2016) (denying summary judgment where, although the correction officer position implicated public safety concerns, there was "testimony from [the defendants'] own employees indicat[ing] that at least some [correction officer] positions required less contact with inmates, and there [was] nothing in the record that compels the Court to conclude, at this stage, that maintaining 'care, custody[,] and control' of inmates necessarily entail[ed] interacting with more than 30 inmates at a time or with minors"); *Schroeder*, 2009 WL 1748869, at *13 (denying summary judgment where "it [was] disputed as to what extent [the] plaintiff's position require[d] walking" and "as to what kind of walking, or any [other] physical demands . . . bearing on his foot's condition . . . [was] essential for the job"); *cf. Silver v. Entergy Nuclear Power Ops., Inc.*, 290 F. Supp. 3d 234, 245–46 (S.D.N.Y. 2017) (granting summary judgment on ADA claim where the employer's

judgment, position description, CBA, and other evidence all indicated that maintaining an "unescorted access authorization" is an essential function of a nuclear security officer).

Because there is a dispute of material fact as to the essential functions of the Watchperson position, there is necessarily a dispute of material fact as to whether Plaintiff was "qualified to perform" those functions "with . . . reasonable accommodation," as required to state a prima facie case of disability discrimination. *McMillan*, 711 F.3d at 125; *accord* 42 U.S.C. § 12111(8). Accordingly, the Court denies Defendant's Motion for Summary Judgment.[8]

## III. Conclusion

For the foregoing reasons, the Court denies Defendant's Motion for Summary Judgment. The Clerk of the Court is respectfully requested to terminate the pending Motion. (Dkt. No. 66.) The Court will hold a Status Conference on October 17, 2019 at 2:00 p.m.

SO ORDERED.

DATED:    September $\underline{5}$, 2019
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[8] Because the Court denies Defendant's Motion for Summary Judgment, it need not consider Plaintiff's "alternative" request for additional discovery. (Pl.'s Mem. 2 & n.2; Pl.'s Sur-Reply 10.)